UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,            :

      -v.-                                  :            13 Cr. 020 (PAE)

ANGELO FERNANDEZ,                        :

             Defendant.             :
------------------------------------------------------x


# GOVERNMENT'S MEMORANDUM OF LAW IN OPPPOSITION TO PETITIONER'S MOTION FOR HABEAS RELIEF


                                            GEOFFREY S. BERMAN
                                            United States Attorney
                                            Southern District of New York
                                            One St. Andrews Plaza
                                            New York, New York 10007


Damian Williams
Assistant United States Attorney
- Of Counsel

**Preliminary Statement**

Angelo Fernandez was found guilty following a one-week trial before this Court—a trial that featured overwhelming evidence of Fernandez's participation in (and control over) a long-running narcotics operation that crippled 1360 Plimpton Avenue in the Bronx.

Indictment 13 Cr. 020 (PAE) (the "Indictment") was filed on January 11, 2013, in two counts.[1] Count One charged Fernandez with distribution and possession with intent to distribute 280 grams and more of mixtures and substances containing cocaine base, in a form commonly known as "crack," in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A), and less than 50 kilograms of marijuana, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(D). Count Two charged Fernandez with possessing a firearm in furtherance of a drug trafficking offense, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

Trial against Fernandez on Counts One and Two commenced on August 19, 2013, and ended on August 22, 2013, when the jury returned verdicts of guilty on Count One and not guilty on Count Two.

On July 30, 2014, the Court sentenced Fernandez principally to 325 months' imprisonment, to be followed by five years of supervised release.

Fernandez is currently serving his term of imprisonment.

**Statement of Facts**

**A.     The Government's Case**

The Government's proof at trial established that Fernandez controlled a long-running narcotics operation in and around 1360 Plimpton Avenue in the Bronx, New York. Fernandez took

---

[1] On August 8, 2013, the grand jury returned a superseding indictment that added "Patron" as one of Fernandez's aliases. In all other respects, the superseding indictment was identical to the original indictment.

1

control of the narcotics operation in 2003 when the prior leader—a man named Richard Soto—was murdered. (Tr. 60; GX 220T at 6).[2] In the decade that followed, Fernandez served as the group's leader, financial provider, and enforcer. (*See, e.g.*, GX 220T at 7-9).

For years, Fernandez and his co-conspirators used 1360 Plimpton Avenue and the playground immediately across the street as their base of operations. (Tr. 208-09). The conspiracy utilized vacant apartments within the building and the playground itself to store narcotics and to serve customers. (*See, e.g.*, *id*. at 132, 135, 142, 257). Fernandez and his co-conspirators sold crack cocaine and marijuana with regularity; indeed, the evidence at trial showed that 1360 Plimpton Avenue functioned as a bona fide open-air drug market, with workers working in shifts, (*id*. at 210), and between 70 and 80 non-residents entering the building every night to purchase narcotics, (*id.* at 258). The New York City Police Department ("NYPD") regularly seized crack cocaine and marijuana that Fernandez and his co-conspirators hid in the building's light fixtures, (*id.* at 297, 453) and in various apartments, (*id.* at 317).

In September 2012, the NYPD introduced a confidential informant (the "CI") who, over a three-month period, purchased crack cocaine and marijuana from Fernandez's co-conspirators. Of thirty-three controlled purchases, thirty-one were audio and video recorded. (*Id.* at 65). The controlled purchases revealed a well-organized conspiracy with a strict division of labor. Daniel Montanez ("Montanez") and Jeffrey Minaya ("Minaya") were the group's primary distributors of crack cocaine. (*Id*. at 69). Montanez and Minaya were highly mobile; they distributed crack cocaine both in and around 1360 Plimpton Avenue and in other nearby locations if called by a customer. (GX 220T at 14-15). Elsio Rivera ("Rivera") and Hector Melendez ("Melendez") primarily sold marijuana but also routinely brokered crack cocaine sales in and around 1360 Plimpton Avenue.

---

[2] "Tr." refers to the trial transcript; "GX" refers to a Government exhibit admitted at trial.

2

(Tr. 69). Alexis Azcona ("Azcona") was mostly responsible for marijuana transactions. (*Id.*). These men, no matter their assigned drug, were workers; they each participated in direct hand-to-hand controlled buys with the CI. (*Id.*).

By contrast, Fernandez supervised the operation and did not directly service customers. (*Id.* at 120-21). When he was present for a controlled buy, Fernandez played the role of manager, placing phone calls to summon his crack dealers to Plimpton Avenue, (*id.* at 69-70; *see also* GX 409, 410), but being careful to never distribute the narcotics himself.[3] That leadership role is consistent with the Government's evidence at trial, which showed that Fernandez was responsible for financing the group's operations, (GX 220T at 9), and enforcing its rules through intimidation and violence. (Tr. 209; 222; 226; 260; 456).

To explain the nature of the conspiracy and the leadership role Fernandez played in it, the Government introduced into evidence a December 7, 2012 video of a controlled buy between Montanez, a key crack dealer in the conspiracy, and the CI. On that day, Montanez and the CI met outside Montanez's residence to conduct a crack cocaine transaction. As the two men walked, Montanez confided in the CI and provided a clear window into the conspiracy's genesis, development and operation. Montanez repeatedly referred to Fernandez as "the boss" of the organization. (*See* GX 220T at 4 ("But the thing is he's the boss… uh… That's… that block… that… that's his block.").) He explained that the group "got like 15 years on that block" and that Fernandez became the leader when the prior leader "got killed" and the group elected Fernandez to be the new leader. (*Id.* at 5-7 ("[W]e put him in his position, like, 'Here, you stay with the boss. You be the boss.").) Montanez told the CI that, as the boss, Fernandez is "the one that puts the

---

[3] Rafael Rodriguez, a former superintendent at 1360 Plimpton Avenue, however, testified that he purchased marijuana directly from Fernandez on at least one occasion. (Tr. 211, 234).

money up" for the crack cocaine.  (*See id.* at 9).  Montanez finally explained that Fernandez "makes . . . 4,000 dollars a week" just from the conspiracy's marijuana distribution, and that his all-in earnings were likely higher once the crack cocaine proceeds were taken into account.  (*See id.* 18-19).

Multiple lay witnesses confirmed Fernandez's leadership role atop the conspiracy.  Rafael Rodriguez ("Rodriguez"), a former superintendent at 1360 Plimpton Avenue, testified that he routinely observed a large quantity of drug sales while watching the building's closed circuit television system.  (Tr. 203-04).  Clearly believing Fernandez to be the leader of the conspiracy, Rodriguez went to Fernandez directly to complain about the widespread drug distribution in the building's hallways.  Fernandez assured Rodriguez that "he would take care of it."  (*Id.* at 208-09).  Rodriguez also testified that on "numerous" occasions, he observed Fernandez receiving large quantities of money or drugs from co-conspirator Melendez.  (*Id.* at 209).  And Rodriguez testified that he often observed Fernandez threaten his subordinates within the conspiracy, including one instance in which Fernandez grabbed Melendez and hung him over the edge of the building.  (*Id.* at 209).  When Rodriguez attempted to stop Fernandez and his workers from using empty apartments to distribute narcotics, Fernandez interceded and made clear that Rodriguez could "get hurt" for interfering.  (*Id.* at 222).  Ultimately, after Rodriguez reported drug activity to the NYPD, Fernandez issued a chilling threat: Fernandez gave Rodriguez and his family "three days to leave the building," (*id.* at 226), or else Fernandez would "stab everyone up," (*id.* at 228).

Santo Penn-Richards ("Penn-Richards"), the previous superintendent at 1360 Plimpton Avenue from 2006 to 2012, had a similar experience when he tried to combat the conspiracy's corrosive impact on the building.  Like Rodriguez, Penn-Richards witnessed a parade of customers coming to 1360 Plimpton Avenue to purchase narcotics.  (*Id.* at 447).  Like Rodriguez, Penn-

Richards observed Fernandez interacting aggressively with members of the conspiracy, including instances where he "would be shouting at them." (*Id.* at 451). And, like Rodriguez, Penn-Richards received a threat from Fernandez after Penn-Richards called law enforcement. (*Id*. at 454). In 2009, Penn-Richards found a gun in one of the building's mailboxes and quickly called the NYPD. (*Id*.). Days later, Fernandez and one of his associates confronted Penn-Richards. Penn-Richards testified that, during the interaction, Fernandez's associate said that he and Fernandez "suspected that I called the police on them. And that was not something good for me, it could be dangerous. Also for my family." (*Id*. at 456). Penn-Richards eventually stopped working at 1360 Plimpton Avenue in 2012 because, as he put it, the "environment there was too dangerous by then." (*Id.* at 458).

Finally, Ephraim Weiss ("Weiss"), the property manager at 1360 Plimpton Avenue, testified about widespread drug sales in the building. (*Id*. at 257). Like Rodriguez and Penn-Richards, Weiss observed a high volume of people coming to the building to purchase narcotics. (*Id.*). Weiss also observed Fernandez receiving money from co-conspirators who were selling drugs. (*Id.* at 258). He also witnessed Fernandez impose discipline among his co-conspirators by, for instance, "beat[ing] up one of his guys in front of a door." (*Id.* at 260). Weiss took various steps to mitigate the drug problem and, at one point, attempted to lock the vacant apartments that Fernandez and his co-conspirators were using for narcotics distribution. (*Id*. at 262). Weiss also sought to ban Fernandez from the building altogether. (*Id*. at 262). These steps angered Fernandez. Indeed, Weiss testified that Fernandez eventually approached Weiss and "asked me why I'm bothering his business." (*Id*. at 264).

Fernandez's use and possession of firearms contributed to his status as leader. For instance, in October 2004, shortly after becoming the leader of the conspiracy, Fernandez shot Itzel Casanova

("Casanova") after Casanova attempted to move into a vacant apartment that the conspiracy was using to store narcotics. (*Id.* at 45).

And, in December 2009, Fernandez was again arrested after the NYPD discovered a firearm, 181 bags of crack cocaine, 381 bags of marijuana, and a digital scale inside an apartment occupied by Fernandez's girlfriend, Liza Reyes ("Reyes"), who allowed Fernandez to use her bedroom to store his contraband. (*See, e.g.*, *id*. at 315-17.)

During Fernandez's tenure as leader, the conspiracy distributed well over 280 grams of crack cocaine and succeeded in making 1360 Plimpton Avenue one of the most crime-plagued addresses in the Bronx.

**B.     The Verdict**

After five hours of deliberations, the jury returned a split verdict, finding Fernandez guilty of Count One, the narcotics charges, and not guilty of Count Two, the firearms offense.

**C.     The Sentencing**

On July 30, 2014, the Court sentenced Fernandez to 325 months' imprisonment on Count One, to be followed by five years' supervised release. In calculating the Guidelines range for Fernandez's sentence, the Court applied a two-point enhancement for Fernandez's possession of both the gun the NYPD seized in December 2009 and the gun used to shoot Itzel Casanova in 2004. (Sentencing Tr. at 23).

**D.     The Appeal**

On appeal, Fernandez contested the sufficiency of the evidence establishing that he was a member of the narcotics conspiracy and challenged the procedural reasonableness of the sentence imposed by this Court. On January 28, 2016, the Second Circuit, in a summary opinion, denied

Fernandez's appeal. *United States v. Fernandez*, 636 Fed. Appx. 71 (2016). After unsuccessfully seeking a writ of certiorari, Fernandez filed this petition for post-conviction relief.

## ARGUMENT

### I. FERNANDEZ PROCEDURALLY DEFAULTED HIS PROSECUTORIAL MISCONDUCT CLAIM

In seeking post-conviction relief, Fernandez first advances a series of arguments which, taken together, amount to a claim that the Government committed prosecutorial misconduct by presenting improperly-obtained evidence to the grand jury and at trial. According to Fernandez's petition, the "poisonous tree," as it were, is the December 2009 search of Liza Reyes's apartment, in which the NYPD discovered, among other things, a firearm and a substantial amount of crack cocaine. In Fernandez's telling, this search violated the Fourth Amendment, and, as a result, the evidence obtained pursuant to the search should have been suppressed for all purposes in the federal prosecution that followed. The use of that evidence to secure an indictment and conviction, the argument concludes, amounts to prosecutorial misconduct. As explained more fully below, this claim is procedurally defaulted because Fernandez failed to raise it on direct appeal.

#### A. Relevant Facts

On December 8, 2009, Sergeant Danny Diaz ("Diaz") and Officer Alberto Puente ("Puente") received information that Fernandez had stored a firearm inside of Apartment 1D at 1360 Plimpton Avenue. Diaz and Puente knocked on the door, and Liza Reyes answered. The men explained that they were looking for Fernandez and that they had information that he was storing a firearm inside. Reyes provided written consent to search the apartment. (Ex. A). Reyes then escorted the officers to her bedroom and showed them a large black plastic bag. (Tr. 314). Inside the large bag, Diaz found men's clothing and a smaller black bodega bag. (*Id*.). The black bodega bag contained a 9-

7

millimeter firearm. (*Id*. at 315). After discovering the firearm, Diaz found over 14 grams of crack cocaine in plain view on Reyes's dresser. (*Id*. at 317). Diaz also discovered a quantity of marijuana, ecstasy and drug paraphernalia inside of Reyes's bedroom. (*Id*. at 318-21).

Reyes was immediately placed under arrest. After signing a Miranda waiver form, Reyes provided a written statement in which she stated that Fernandez asked her to "hold some bags for him cause he got into a[n] argument with his mom and he said he'll be back to pick it up when he rents a room." (Ex. B). Reyes stated that she agreed to his request but told Fernandez that he had to "take your bags out right away." (*Id.*). Reyes explained that Fernandez "live[d] with his mother" but that she didn't "know where he been staying for a couple weeks." (*Id.*).

In 2010, Reyes and Fernandez filed a civil lawsuit against the City of New York and the individual officers who searched Reyes's apartment. On September 8, 2011, Reyes was deposed in connection with that litigation. (Ex. C). Fernandez was present for the deposition. (*Id.* at 2). In her testimony, Reyes claimed that she never consented to a search of her apartment. (*Id.* at 47). Reyes claimed that she never waived her Miranda rights. (*Id.* at 48-49). She even denied providing the police with a written statement. (*Id.* at 54). She further claimed that Fernandez never told her that he had a fight with his mother and that he never asked her to hold his belongings. (*Id.* at 57). Reyes finally denied that her bedroom contained a 9-millimeter firearm, any controlled substance, or any drug paraphernalia. (*Id.* at 59-60).

On September 8, 2011, immediately after Reyes's testimony concluded, Fernandez was deposed. In his testimony, Fernandez claimed that he never asked Reyes to hold any drugs or guns for him in December 2009. (Ex. D at 32). He denied telling Reyes that he had a fight with his mother and that he needed her to hold some of his personal belongings. (*Id.*). He also denied ever having a romantic relationship with Reyes.

8

On March 12, 2013, ten days after Fernandez was arrested while hiding with Reyes, Reyes testified before a federal grand jury sitting in this District. (Ex. E). In that testimony, Reyes admitted that she provided a written statement to the NYPD. (*Id*. at 7). She also confirmed that Fernandez lived with his mother and admitted that he asked her to hold his belongings in December 2009. (*Id*. at 8-9). Reyes explained that she eventually instructed Fernandez to retrieve his belongings from her apartment because she and Fernandez "were going through our own little personal relationship problems." (*Id*. at 9). At the end of her testimony, when asked if she was "telling the Grand Jury the truth about what happened in December of 2009," Reyes responded "Yes." (*Id*. at 10).

### B. Applicable Law

As an initial matter, Fernandez's prosecutorial conduct claim is procedurally defaulted because he failed to raise it on direct appeal and cannot establish cause and prejudice sufficient to excuse that default.

It is well-settled that federal prisoners may not employ § 2255 as a substitute for direct appeal. *See, e.g.*, *United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. Addonizio*, 442 U.S. 178, 184-85 (1979). As the Supreme Court explained in *Frady*, "[o]nce the defendant's chance to appeal has been waived or exhausted, . . . we are entitled to presume he stands fairly and finally convicted, especially where, as here, he already has a fair opportunity to present his federal claims to a federal forum." *United States v. Frady*, 456 U.S. at 164. "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citations omitted); *accord Massaro v. United States*, 538 U.S. 500, 504 (2003) ("claims not raised on direct appeal may not be raised on

9

collateral review unless the petitioner shows cause and prejudice"); *United States v. Warren*, 335 F.3d 76, 79 (2d Cir. 2003) ("If the defendant fails to raise a claim of error on direct appeal, habeas relief is generally available only upon a showing of cause and prejudice.").

The Supreme Court has made clear that "cause" is measured by a stringent standard of diligence. *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("cause" is "something external to the petitioner" that "cannot be fairly attributed to him"; "[a]ttorney ignorance or inadvertence is not 'cause'"); *Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("cause" standard requires movant to demonstrate effect of some external factor, like "interference by officials"). Further, to establish prejudice, a petitioner must establish "actual and substantial disadvantage, infecting [the defendant's] entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. at 170.

If a defendant fails to establish "cause" and "prejudice" to excuse a procedural default, he can obtain collateral review of his constitutional claim only by demonstrating that the constitutional error "has probably resulted in the conviction of one who is actually innocent." *Bousley v. United States*, 523 U.S. at 623. The Supreme Court has emphasized that "'actual innocence' means factual innocence, not mere legal insufficiency." *Id*.

### C. Discussion

Fernandez failed to raise his prosecutorial misconduct claim on direct appeal. Instead, as noted above, Fernandez's appeal focused on two issues: (1) the sufficiency of the evidence supporting the jury's guilty verdict and (2) the procedural reasonableness of the sentence Fernandez received. Nor can Fernandez demonstrate "cause" for his default. He has long been aware of the Government's reliance on the evidence obtained during the December 8, 2009 search. After all, the gun recovered during the search formed the basis for Count Two of the Indictment. Finally, in light

of the evidence introduced at trial, Fernandez cannot plausibly claim to be actually innocent. Accordingly, Fernandez's procedural default cannot be excused and his prosecutorial misconduct claim necessarily fails.

## II. FERNANDEZ'S DEFENSE COUNSEL WAS NOT CONSTITUTIONALLY INEFFECTIVE

Fernandez next asserts that his counsel rendered constitutionally ineffective assistance of counsel for failing to move to suppress evidence seized by the NYPD on December 8, 2009 from Reyes's apartment. Fernandez's argument is misplaced for two reasons. First, any suppression motion would have been meritless in light of Reyes's written consent to search and Fernandez's prior sworn testimony that he lacked any connection to Reyes's apartment. (Exs. A and D). Second, in light of the overwhelming evidence connecting Fernandez to the charged conspiracy, the jury's verdict would be the same and Fernandez's sentence would have been the same absent the December 8, 2009 evidence. Accordingly and for the reasons set forth below, Fernandez's claim is meritless and should be denied.

### A. Applicable Law

To prevail on a claim of ineffective assistance of counsel, a defendant must clear two high hurdles. First, he must overcome a "strong presumption" that counsel's conduct was reasonable and show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." Second, he must "affirmatively prove prejudice" by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-89, 693-94 (1984); *accord, e.g.*, *United States v. Vegas*, 27 F.3d 773, 777 (2d Cir. 1994); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); *United States v. Tarricone*, 21 F.3d 474, 475 (2d Cir. 1993); *United*

*States v. Eisen*, 97 4 F.2d 246, 265 (2d Cir. 1992); *Tate v. Wood*, 963 F.2d 20, 26 (2d Cir. 1992). Only if both elements of the test are satisfied can one conclude that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Fernandez cannot satisfy this "rigorous" standard. *United States v. Feyrer*, 333 F.3d 110, 119 (2d Cir. 2003) (citing *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001)).

When analyzing a claim that counsel's performance failed to meet constitutional standards, a "court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689). The assessment of counsel's performance under *Strickland* focuses on the "fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696. The emphasis should not be on grading counsel's performance. Instead, the inquiry is "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process." *Id*.

Furthermore, even if an attorney's performance was objectively unreasonable and unprofessional, the defendant must also prove prejudice. The defendant "must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687). The reviewing court must assess "whether, absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different." *Mayo v. Henderson*, 13 F.3d at 534. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id*. (quoting *Strickland*, 466 U.S. at 694). Moreover, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. at 369. "[T]he

12

prejudice component of the *Strickland* test . . . focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Id*. at 372; *see Bunkley v. Meachum*, 68 F.3d 1518, 1522-23 (2d Cir. 1995).

Where the allegation of ineffective assistance is based on a failure to file a suppression motion, both the performance and prejudice prongs of the *Strickland* ineffectiveness test have been refined further. In this context, the presumption of competent attorney performance under *Strickland* will be rebutted only if the defendant proves that defense counsel failed "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland*, 466 U.S. at 691). To demonstrate prejudice for failing to make a suppression motion, the defendant must show both that the motion is meritorious and that there is a reasonable probability that the outcome of the proceeding would have been different if the evidence had been suppressed. *See Matos*, 905 F.2d at 32 (citing *Kimmelman*, 477 U.S. at 375); *Laaman v. United States*, 973 F.2d 107,113 (2d Cir. 1992) ("'Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the [defendant] must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.'") (quoting *Kimmelman*, 477 U.S. at 375); *see United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir. 1987); *United States v. Caputo*, 808 F.2d 963, 967 (2d Cir. 1987); *United States v. Cruz*, 785 F.2d 399, 406 (2d Cir. 1986).

In assessing claims that counsel's failure to file a suppression motion constitutes ineffective assistance, the Second Circuit has held that, "for purposes of effective assistance, not every possible motion need be filed, but rather, only those having a solid foundation. Counsel certainly is not

13

required to engage in the filing of futile or frivolous motions." *United States v. Nersesian*, 824 F.2d 1294, 1322 (2d Cir. 1987); *accord Jones v. Barnes*, 463 U.S. 745, 754 (1983); *Mayo*, 13 F.3d at 533. Thus, "the failure to file a suppression motion does not constitute per se ineffective assistance of counsel." *Kimmelman*, 477 U.S. at 384.

### B. Discussion

#### 1. A Suppression Motion Here Would Have Been Meritless Because the Record Establishes That Fernandez Had No Expectation of Privacy in Liza Reyes's Bedroom

To succeed on a motion to suppress the evidence recovered from Liza Reyes's bedroom, Fernandez would first have had to establish that he had standing to file that motion—that is, to show that Fernandez himself had a reasonable expectation of privacy in Liza Reyes's bedroom. The Fourth Amendment "protects persons against unreasonable searches" of their persons, houses, papers and effects. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). Based on the language of that provision, the Supreme Court has held that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). For that reason, "a defendant's Fourth Amendment rights are violated 'only when the challenged conduct invaded his legitimate expectation of privacy rather than that of a third party.'" *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002) (quoting *United States v. Payner*, 447 U.S. 727, 731 (1980)) (emphasis in original). To invoke the protection of the Fourth Amendment, "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. at 88. The reasonableness of an asserted expectation of privacy turns on whether that expectation "has a 'source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id.* (quoting *Rakas v. Illinois*, 439 U.S. at 143 n.12). A reasonable

14

expectation of privacy does not arise merely from being lawfully present at a particular location. *Rakas*, 439 U.S. at 148. Indeed, the Supreme Court has held that individuals present inside an apartment, with the permission of its lessee, had no reasonable expectation of privacy inside the apartment where (i) their reason for being present was "purely commercial," (ii) they spent a "relatively short period of time on the premises," and (iii) they "lack[ed] . . . any previous connection" to the leaseholder. *Carter*, 525 U.S. at 91. Accordingly, an individual who simply stores drugs or other contraband—such as the narcotics, packaging material, and firearm at issue here—in a location where he or she has no right to exclude others from the area, and takes no steps to maintain his privacy, has no legitimate expectation of privacy in the storage location. *See, e.g.*, *Rawlings v. Kentucky*, 448 U.S. 98, 104-105 (1980) (finding that a defendant had "no legitimate expectation of privacy in a friend's purse, where he had stored drugs because petitioner did not "have any right to exclude other persons from access to Cox's purse" and the record "hardly supports a reasonable inference that petitioner took normal precautions to maintain his privacy.")

Here, Fernandez would not be able to demonstrating standing. While Fernandez could arguably establish an expectation of privacy if he were an overnight guest at Reyes's apartment, the record here simply does not support this—indeed, it directly contradicts it. In his deposition, Fernandez testified that he has lived his whole life at 1360 Plimpton Avenue, in apartment 4D (Ex. D at 6-7). Further, as described above, Fernandez testified under oath that he had never asked Reyes to hold any of his property in December 2009. (Ex. D at 32). Reyes similarly testified that Fernandez never asked her to hold his belongings. (Ex. C at 59-60). As the Court is aware, Reyes contradicted this testimony in her federal grand jury testimony, where she stated (again under oath— but this time without Fernandez himself looking on) that Fernandez had asked her to hold his belongings in December 2009. (Ex. E at 8-9). Thus, in order to establish Fernandez's standing for a

suppression motion, Reyes and/or Fernandez would have had to directly contradict their prior, sworn testimony, thereby exposing one or both of them to criminal liability for perjury.

Further, even if Fernandez was able to establish that he had standing to bring a suppression motion—which, based on this record, he would not have been able to—the fact remains that Reyes consented to the search. *See Fernandez v. California*, 134 S. Ct. 1126, 1129 (2014) (instructing "our cases firmly establish that police officers may search jointly occupied premises if one of the occupants consents."); *see also United States v. McGee*, 564 F.3d 136, 137 (2d Cir. 2009) (finding that the defendant's girlfriend gave valid consent to search the defendant's home). Therefore, in order to prevail on a suppression motion, Fernandez would have needed Reyes to contradict the testimony of the NYPD officers who witnessed her filling out the consent form—again exposing her to criminal liability for perjury charges, as well as potential criminal exposure for her involvement in the underlying drug conspiracy. Fernandez's counsel cannot be found ineffective for not pursuing a motion that would have exposed both Fernandez and Reyes to criminal liability, much less one that is ultimately meritless. *See, e.g.*, *United States v. Tisdale*, 195 F.3d 70, 73-74 (2d Cir. 1999) ("Trial counsel's failure to bring a meritless suppression motion cannot constitute ineffective assistance.").

### 2. Fernandez Suffered No Actual Prejudice From The Admission Of The Evidence Recovered From Liza Reyes's Bedroom

Even if this Court were to find that Fernandez's trial counsel should have filed a suppression motion and that the motion would have succeeded, Fernandez did not suffer any prejudice. As noted above, the gun recovered from Reyes's apartment in December 2009 formed the basis for Count Two of the Indictment. The jury, however, acquitted Fernandez on that count. Nor was Fernandez prejudiced at sentencing by the admission of the firearm. During sentencing, the Court applied a two-point enhancement under § 2D1.1(b)(1) not only because of Fernandez's possession of the 2009

16

gun, but also because of Fernandez's possession of a firearm in connection with the shooting of Itzel Casanova in 2004. (Sentencing Tr. at 23). Thus, even if the 2009 gun had been suppressed, the two-point enhancement still would have applied. *See United States v. Fernandez*, 636 Fed. Appx. at 74 n.3 (affirming two-level enhancement based on Fernandez's possession of the 2004 gun).

Fernandez similarly suffered no prejudice from the introduction of the narcotics recovered from Reyes's bedroom. The Government's proof of Fernandez's participation in the narcotics conspiracy was overwhelming. It included video recordings of narcotics sales overseen by Fernandez and statements of Fernandez's co-conspirators, testimony from lay witnesses about Fernandez conducting drug business in and around 1360 Plimpton Avenue (including his involvement in a shooting while protecting his turf), and evidence of Fernandez and his co-conspirators' prior arrests for possession of narcotics and/or narcotics trafficking. The drugs recovered from Reyes's bedroom were but one small piece of the evidence of the narcotics conspiracy, and thus it would be incredibly difficult if not impossible for Fernandez to suggest that he was prejudiced at trial by their admission into evidence. Indeed, at sentencing, the Court noted that the quantity of crack cocaine distributed "substantially exceeds . . . 280 grams." (Sentencing Tr. at 23).

In sum, even if Fernandez's counsel had filed a motion to suppress the evidence recovered from Reyes's bedroom in December 2009, and even if that motion had succeeded, it would be of no moment here because Fernandez suffered no prejudice. And because Fernandez suffered no prejudice, his motion for relief must be denied.

## **CONCLUSION**

For the reasons set forth above, the Court should deny Fernandez's petition for post-conviction relief.

                                        Respectfully submitted**,**
                                        GEOFFREY S. BERMAN
                                        United States Attorney
                                        Southern District of New York

By: _____
                                        Damian Williams
                                        Assistant United States Attorney

Dated: New York, New York
        August 27, 2018