UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

UNITED STATES OF AMERICA,

-v-

ANGELO FERNANDEZ,

Defendant.

13 Cr. 20 (PAE)

OPINION & ORDER

------------------------------------------------------------

PAUL A. ENGELMAYER, District Judge:

The Court has received a *pro se* motion from defendant Angelo Fernandez, seeking compassionate release from United States Penitentiary ("USP") Yazoo City, in Yazoo City, Mississippi, pursuant to 18 U.S.C. § 3582(c)(1)(A). Dkt. 207 ("Def. Mtn."). For the reasons that follow, the Court denies the motion.

**I.     Background**

Fernandez's offense conduct, as established at trial and as set forth in the presentence report, Dkt. 210, Ex. A ("PSR"), was as follows. For nearly a decade, Fernandez led a violent narcotics crew that sold prodigious amounts of crack cocaine and marijuana. The crew dominated the 1300 block of Plimpton Avenue in the Bronx. The crew was based in Fernandez's apartment building at 1360 Plimpton Avenue ("1360 Plimpton")—over whose residents and workers, Fernandez, using threats of retaliation, wielded effective control—and stored its drugs, drug paraphernalia, and at times, a gun, there. The crew made drug sales throughout and around 1360 Plimpton and in an adjacent playground, where the crew also stashed narcotics, including in a fountain. Fernandez, who went by the nicknames "El Patron," "Scarface," and "Plimpton King," supervised the crew's more than five members, who primarily carried out the crew's hand-to-hand crack sales. Fernandez used violence and threats of violence

to maintain authority. On one occasion, a new resident of the building, Itzel Casanova, confronted him about the drug sales; Fernandez shot her, grazing her in the back. Fernandez also memorably threatened to stab 1360 Plimpton's superintendent, Rafael Rodriguez, and Rodriguez's wife and four children, if Rodriguez, who had called the police about the drug dealing in the building, did not relocate. There was credible testimony at trial, too, of similar retaliatory threats by Fernandez towards another superintendent and a property manager at 1360 Plimpton.

On January 11, 2013, Fernandez and others were indicted on two counts—one charging participation in a crack cocaine and marijuana conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), and another charging possession of a firearm in furtherance of that offense, in violation of 18 U.S.C. § 924(c). Upon his codefendants' arrests, Fernandez went into hiding; on March 1, 2013, he was eventually found, hiding under a bed in the home of a family friend, and arrested. Fernandez was convicted after a four-day jury trial on Count One—on which the jury found a conspiracy to traffic in 280 grams or more of crack cocaine—and acquitted on Count Two. On July 30. 2014, the Court sentenced Fernandez to a Guidelines sentence of 325 months' imprisonment, to be followed by five years' supervised release, finding—as developed below—numerous 18 U.S.C. § 3553(a) factors to demand a long prison term. Fernandez's release date from USP Yazoo City is projected as October 12, 2036.

On January 27, 2023, Fernandez, *pro se*, filed a motion for compassionate release. *See* Def. Mtn. He argues that the COVID-19 pandemic presents a risk to his health; that prison conditions since the onset of the pandemic have been harsh; and that the Court should use the opportunity presented by his motion to reduce his sentence in light of a recent memorandum from U.S. Attorney General Merrick Garland with respect to charging decisions and sentencing

advocacy in narcotics cases, including defining more narrowly than previously the circumstances under which the Department of Justice would henceforth charge amounts triggering mandatory minimum sentences. Fernandez argues that the § 3553(a) factors also support his release because he has completed numerous educational and vocational training programs in prison and because he has worked hard to become a better person. The Government opposes Fernandez's motion. *See* Dkt. 210 ("Gov't Mem.").[1]

## II.  Discussion

### A.  Standards Governing Compassionate Release Motions

"[U]pon motion of the defendant," and "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," the Court may reduce such defendant's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). The defendant bears the burden of proving he is entitled to compassionate release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010).

Originally, § 3582(c)(1)(A) did not permit defendants to initiate compassionate release proceedings; it required the BOP to seek such release on their behalf. *United States v. Phillibert*, 557 F. Supp. 3d 456, 459 (S.D.N.Y. 2021). However, "[a]s part of the First Step Act of 2018,

---

[1] The Government does not contest that Fernandez has exhausted his administrative remedies. *See* Gov't Mem. at 5 n.3.

Congress authorized courts to reduce a term of imprisonment upon motion by a defendant." *United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022) (per curiam).

Congress tasked the Sentencing Commission with identifying the circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence. *United States v. Brooker*, 976 F.3d 228, 232 (2d Cir. 2020) (citing 28 U.S.C. § 994(t)). The Commission did so in U.S.S.G. § 1B1.13 and its commentary, which, *inter alia*, (1) define various circumstances that present extraordinary and compelling reasons justifying release; and (2) require that a defendant not be a danger to the safety of the community. U.S.S.G. § 1B1.13(1)–(3) & cmt. n.1. However, the guidance under this provision applies only to a "motion of the Director of the Bureau of Prisons." *Id.* § 1B1.13. It does not apply "to compassionate release motions brought by defendants," rather than by the BOP, and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling" in such cases. *Brooker*, 976 F.3d at 236 (internal quotation marks omitted); *see also id.* at 237 ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."). Thus, when assessing a motion brought by an imprisoned defendant and not the BOP, the Court is not constrained by U.S.S.G. § 1B1.13's enumeration of extraordinary and compelling reasons and may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Id.* at 237. Even if such reasons are present, the Court must also assure itself that release is consistent with "the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A).

**B.     Analysis**

4

Fernandez argues that he has demonstrated extraordinary and compelling reasons so as to make him eligible for compassionate release and that the § 3553(a) factors favor such release. The Government argues the contrary. Fernandez's argument is frivolous on both accounts and is rightly decisively dispatched.

### 1. Extraordinary and Compelling Circumstances

The Court does not find extraordinary and compelling circumstances sufficient to justify release or a reduction of sentence. Fernandez predominantly relies upon the risk that the COVID-19 pandemic presents to inmates' health. But unlike prisoners who have credibly advanced such claims, Fernandez does not identify any underlying medical or physical condition that puts him personally at greater risk were he to contract COVID-19. Nor, despite his general plaint to have been denied "timely medical care" as a result of lockdowns at Federal Correctional Institute ("FCI") Yazoo City,[2] Def. Mtn. at 9, do Fernandez's medical records support this claim. As the Government notes, these reflect that Fernandez is receiving care for the medical issues he has from time to time reported to medical personnel at FCI Yazoo City. *See* Gov't Mem. at 7 n.4; *id.*, Exs. B, D.

Nor has Fernandez been vaccinated or boosted. Fernandez concedes that he has declined to be vaccinated, stating, in passing, that in 2017, he was diagnosed with hypertension, and that he did not "know[] how his body would react to the vaccine." Def. Mtn. at 8. But Fernandez, while stating that this was "also the opinion" of unnamed "medical staff" at FCI Yazoo City, does not identify any such personnel; and as the Government notes, his prisoner medical records

---

[2] FCI Yazoo City is a low-security facility with adjacent satellite prison camp houses for minimum-security offenders. USP Yazoo City is a high-security facility. Both facilities are part of the same complex. The Court understands the Government's and Fernandez's various references to these facilities as interchangeable, insomuch as they all seek to describe Fernandez's current place of incarceration.

5

do not reflect that any medical provider advised him not to get the vaccine. Moreover, as the Government notes, medical journals and publications, far from advising against vaccination for persons who suffer from hypertension, recommend such vaccination. *See* Gov't Mem. at 7 (citations omitted). Insofar as Fernandez is unable to claim any risk from COVID-19 not faced by the rest of the populace, and is unwilling to take the single step—vaccination—that would most stand to reduce a person's risks from COVID-19, Fernandez, under the assembled case law, cannot claim to face "extraordinary and compelling" circumstances. *See, e.g., United States v. May*, No. 18 Cr. 688 (ALC), 2022 WL 255315, at *1 (S.D.N.Y. Jan. 26, 2022) (denying compassionate release of defendant who refused vaccination and whose "medical conditions, coupled with the threat of contracting COVID-19, do not establish extraordinary and compelling reasons"); *United States v. Robinson*, No. 17 Cr. 611-7 (AT), 2021 WL 1565663, at *3 (S.D.N.Y. Apr. 21, 2021) (same); *United States v. Ordonez*, No. 13 Cr. 811 (ALC), Doc. No. 765 at 3 (S.D.N.Y Mar. 8, 2021) (same); *United States v. Colon*, No. 18 Cr. 6040, 2021 WL 1246187, at *3 (W.D.N.Y. Apr. 5, 2021) (same).

Fernandez's petition is a particularly far cry from the bulk of those that have been found meritorious. In the months immediately after the pandemic struck in March 2020, numerous courts, including this one, found or assumed extraordinary and compelling circumstances to exist where a defendant's underlying respiratory or other medical conditions exposed them to a heightened risk of death or grave suffering from COVID-19, which was then taking lives on an alarming scale.[3] Fernandez's § 3582(c) motion, however, was filed more than 34 months after

---

[3] *See, e.g., United States v. Wilson*, 16 Cr. 317 (PAE), Doc. No. 656 at 4–7 (S.D.N.Y. Aug. 31, 2020) (ordering compassionate release of defendant with heightened vulnerability who had served the substantial majority of his sentence and played a low-level role in a drug trafficking conspiracy); *United States v. Simon*, 482 F. Supp. 3d 151, 157 (S.D.N.Y. 2020) (ordering compassionate release of elderly defendant, who had serious medical conditions and played a

COVID-19 struck, and nearly two years after vaccinations against the disease became widely available.

Fernandez laments the unexpectedly rigorous conditions at FCI Yazoo City during the height of the pandemic. These heightened restrictions have resulted in lesser or interrupted programming, lockdowns, and reduced opportunities to phone his family. *See* Def. Mot. at 8–9. That grievance, which the Court assumes is anchored in fact, is fair. The pandemic regrettably occasioned restrictions on visits, movement, and programming throughout the federal prison system, with particularly acute impact not only at municipal jails, but also at long-term facilities. However, generalized statements about prison conditions untethered to compelling specifics of the defendant's circumstances do not make the defendant's conditions "extraordinary and compelling." *See, e.g.*, *United States v. Butler*, No. 18 Cr. 834-10 (PAE), 2022 WL 17968627, at *3 (S.D.N.Y. Dec. 27, 2022) (denying compassionate release of defendant who has "not demonstrated concretely that the prison conditions he face[s] . . . [are] especially severe, so as to rise to the level of extraordinary and compelling circumstances justifying early release"); *United States v. Marmolejos*, No. 19 Cr. 626 (PAE), 2021 WL 807128, at *3 (S.D.N.Y. Mar. 3, 2021) (same); *United States v. Fiseku*, No. 14 Cr. 384-1 (PAE), 2020 WL 7695708, at *4 (S.D.N.Y. Dec. 28, 2020) (same). Fernandez has not shown anything of the sort here.

In a final argument why his circumstances are ostensibly extraordinary and compelling, Fernandez invokes Attorney General Garland's December 2022 Memorandum, directing federal prosecutors, in charging decisions and sentencing advocacy, to treat crack cocaine as equivalent

---

low-level role in a drug trafficking conspiracy); *United States v. Davies*, 469 F. Supp. 3d 175, 180 (S.D.N.Y. 2020) (same); *United States v. Brown*, 467 F. Supp. 3d 209, 213 (S.D.N.Y. 2020) (same); *United States v. Jasper*, No. 18 Cr. 390-18 (PAE), 2020 WL 1673140, at *2 (S.D.N.Y. Apr. 4, 2020) (ordering compassionate release of defendant with an immune-inflammatory disease who had served all but 34 days of a four-month sentence).

7

to powder cocaine, and delineating when narcotics offenses should be charged so as to carry, in the event of conviction, mandatory minimum sentences. The Memorandum instructs federal prosecutors in crack cocaine cases to advocate for a sentence consistent with the Guidelines for powder cocaine rather than crack cocaine. *Additional Department Policies Regarding Charging, Pleas, and Sentencing in Drug Cases*, Op. Att'y Gen. (Dec. 16, 2022) ("AG's Memorandum"); *see* Def. Mtn. at 9–10.

For a host of reasons, this development does not assist Fernandez's bid for compassionate release. For one, as the Government notes, the AG's Memorandum is prospective only. It explicitly does not apply retroactively to persons like Fernandez who had been sentenced before it took effect. *See* Gov't Mem. at 8. For another, even if the AG's Memorandum applied retroactively, for two independent reasons, Fernandez could not credibly seek under it relief from a mandatory minimum. As reflected in the PSR and the Court's sentencing determinations, the relevant conduct of his offense included "the use of violence, the direction to another to use violence, [and] the possession of a weapon," conduct which removes a defendant from the scope of the memorandum. AG's Memorandum at 1–2; *see* PSR ¶¶ 15, 20, 22; Dkt. 169 ("Sent. Tr.") at 9–13, 17, 23–24, 39–44. In addition, as these materials reflect, Fernandez played a "significant managerial role in the trafficking of significant quantities of drugs," which also would deny him relief under the Memorandum. AG's Memorandum at 1–2; *see* PSR ¶¶ 15, 20; Sent. Tr. at 24.

The Court accordingly does not find extraordinary and compelling circumstances justifying a reduction of sentence.

  2. **The § 3553(a) Factors**

Even assuming such circumstances existed, the § 3553(a) factors emphatically would not and could not justify a reduced sentence. The Court exhaustively considered the relevant factors in connection with sentencing, and expanded there on why those factors demanded the sentence imposed. *See* Sent. Tr. at 36–53. The Court here reprises at uncommon length its articulation then of the most significant reasons for the sentence, because the analysis remains 100% persuasive to the Court today. It underscores why the § 3553(a) factors are incompatible with a reduction of Fernandez's sentence, let alone his compassionate release.

***Just punishment***: The long conspiracy to sell huge volumes of crack had endangered users and their families and took place in a playground, in close proximity to little children.

> While your deputies sold crack, little children stood just feet away[,] playing. Did it ever occur to you, at the time you were peddling drugs there[,] what effect exposing the children to drug dealing in a playground might have? Did it occur to you that it might make drug dealing and crack seem [like] legitimate or acceptable options in their eyes? Did it occur to you that it might make it more likely that some[]day[,] some of them would turn to drugs? Or was that part of the plan, simply to create a bigger market and more future customers?

*Id*. at 38–39. The drug dealing was also deleterious to residents of the apartment building which Fernandez controlled and from which his crew sold:

> [T]he 1360 Plimpton building was infested with drugs. They were tucked behind the stairs and exit signs, in an emergency light, in an empty apartment, and in the garbage area. There were black plastic bags hanging from the window sills. The selling took place at all hours of the night, and . . . sometimes with lines out the door. People who wanted nothing to do with crack deals had no choice but to coexist with your crack operation. They, too, were victims of your conduct.

*Id*. Perhaps most disturbing was Fernandez's "use of intimidation, or threats of violence, to protect [his] crack operation," about which four civilian witnesses had credibly testified. Those instances, as summarized by the Court at sentencing, included the following:

> First, Itzel Casanova. She leased an apartment in 1360 Plimpton Avenue. She was soon to move in. She got a call from a friend saying there were men in the kitchen of the new apartment[,] selling drugs. She taxied over there. When she got to the

9

apartment, you were there.  You told her that it was actually your apartment.  She was on the lease, but it was, you told her, your apartment.  Ms. Casanova testified, about you.  "He was cursing, he was very upset, he was very intimidating."  She left, to go retrieve her three-year-old, but the intimidation wasn't over.  On the way out, shots were fired.  Ms. Casanova was grazed by a bullet on her shoulder blade.  She ran away.  Her concern was her safety and that of her son.  She never moved into the apartment.

Second, Rafael Rodriguez.  He was the superintendent of 1360 Plimpton Avenue.  If Ms. Casanova's mistake was to lease an apartment you used for your drug operation, Mr. Rodriguez's mistake was to call the police on you.  He saw drug buyers coming in and out of the building to sell drugs.  He determined that you were in charge of the drug operations.  He was, of course, right about that.  He saw you interacting with the dealers, exchanging money.  He saw you yell at the dealers, he saw you threaten them.  At one point he saw you hang one of your dealers over the edge of the building.  Mr. Rodriguez asked you to stop selling drugs at 1360 Plimpton, but it didn't stop.  To his credit, Mr. Rodriguez kept at it.  He took his job seriously.  At one point, he confronted a man who was selling drugs from an empty apartment in the building, but, he testified, you, Mr. Fernandez, intervened.  You told Mr. Rodriguez that you were in charge of the building.  You threatened him.  He testified about you: "He threatened me.  He said that, you know, you can get hurt, you know.  You don't know about it, but you can get hurt."  Mr. Rodriguez put padlocks on the empty apartments[,] but you got around that too.  He was the superintendent, but you were the king.

Eventually Mr. Rodriguez called the police.  One evening on a day you had called the police, you and another man confronted Mr. Rodriguez at the front door of his apartment.  You told Mr. Rodriguez he had three days to leave the building "or else."  Mr. Rodriguez told you he would not leave.  So you approached Mr. Rodriguez's front door, in his words, "like he"—meaning you—"like he wanted to fight."  Mr. Rodriguez closed the front door.  You stayed outside.  Two hours later, there was a knock on the door to his apartment. Mr. Rodriguez looked through the peephole.  He cracked open the door.  He saw you and Gago, one of your co-conspirators.  You were standing behind Gago[,] pacing.  Gago did the talking.  Gago said[,] "We have a very serious problem here."  Mr. Rodriguez, mind you, had a wife and four children who lived with him in that apartment.  Mr. Rodriguez said[,] "[I]t's 10 at night and it better be an emergency," because he didn't appreciate anyone knocking on his door at that hour unless it was an emergency.

This is what he testified happened next: "As soon as I said that, Mr. Fernandez got really mad.  He aggressively went to the door, slammed the front door of the lobby, because my door was near there, and then he locked the door.  And I took that as intimidating me, that nobody was coming up in here."  Mr. Rodriguez continued.  This was his further testimony about you:  "And then he start[ed] yelling.  He start[ed] hitting the floor.  He got on one knee started hitting the floor, screaming at me with his muscles all pumped out."  Mr. Rodriguez said you told him you had

10

three days to leave the building. Mr. Rodriguez said no. . . . Question: "What happened next?" Answer from Mr. Rodriguez, referring to you: "He came towards me. He came towards me like he wanted to fight. He came towards the door. As soon as I saw him come to the door like that, I close—I close—I close my door."

And this was some of the most dramatic testimony in the case. Mr. Rodriguez grabbed the one weapon he had in his apartment, a baseball bat. He cowered inside his apartment, behind the front door, because he said, "I felt my family was threatened. So I felt that if he came in my house, you know, that I needed to defend my kids and my wife." But you weren't finished. You took up a position outside the first floor window of the apartment where Mr. Rodriguez could hear you. He heard you cursing to your friends. This is what he testified about you: . . . "He was cursing and saying that I didn't know he would go up in there and he would stab everybody up." Question: "What did you understand that to mean?" Answer: That he would come in and kill my whole family," referring to you, Mr. Fernandez. Eventually, Mr. Rodriguez moved out. He moved to South Carolina. And this was his testimony as to why. Question: "How, if at all, did the threat that you received contribute to your decision to move to South Carolina?" Answer: "Yeah, it definitely contributed more than 100 percent because I just didn't feel safe anymore. I didn't feel my kids, my family, my wife were safe anymore."

Third witness, Santos Penn-Richards, the prior superintendent. He was the one who found drugs hidden in the emergency light. He also found a gun hidden in a mailbox. He also made the mistake of calling the police. One of the members of your crew made quite clear to Mr. Penn-Richards that that was a mistake. Your crew member, Mr. Penn-Richards testified, said to Mr. Penn-Richards that they, meaning the drug crew, "suspected that he had called the police on them. And that it was not something good for me, it could be dangerous. Also for my family." Another time, while he was working as superintendent, Mr. Penn-Richards found the brake lines cut on his car which was parked out front of the building. He also moved out. The reason, he testified: "The environment there was too dangerous by then."

Fourth, and finally, Ephraim Weiss. He was the property manager at 1360 Plimpton. He figured out that you were running a drug operation. He called the police. He testified that one time you approached him while he was parking his car across the street from the building. You asked him, he said, "[W]hy I was bothering his business," meaning, of course, the crack business.

*Id*. at 40–44.

***Specific deterrence***: Also supporting the sentence was that Fernandez had persisted in crime despite a long list of arrests and convictions, some in connection with the offense conduct.

11

> In 2004 you pled guilty to assault[,] and you were sentenced to three years' imprisonment, in connection with striking a police officer with closed fists and a golf club. In 2004, as well, you pled guilty to criminal possession of a loaded firearm. That is the incident in which Itzel Casanova was shot. You were sentenced to one-year imprisonment. In 2008 you pled guilty to disorderly conduct. In 2009 you pled guilty to unlawful possession of marijuana, in connection with selling marijuana. In 2010 you again pled guilty to criminal possession of marijuana. In 2011 you pled guilty to petit larceny. In addition, according to the presentence report, you have had five other arrests—in 2004, 2004 again, 2010, 2011, and 2012—which were either adjourned in contemplation of dismissal, dismissed, or did not yield court-reported information that the probation officer could find. Why do I mention all this? Because none of your many prior brushes with the criminal justice system deterred you. Each of them—and certainly them together—should have been a wake-up call. They should have been a message that said stop. Stop selling cocaine. Stope selling marijuana and committing other crimes. Committing these crimes is no way to go through life. But the message didn't get through.

*Id*. at 45–47.

> ***Public protection***: Finally, favoring the sentence imposed was the interest in incapacitation, meaning the need to protect the public from further crimes by you. Given your long criminal record, given your willingness to engage in threats and intimidation when people got in your way, I regret to say that that factor is very important here. I simply cannot have any confidence that even after a relatively long sentence[,] you would not revert to committing crimes. I wish that were otherwise, but actions speak louder than words[,] and your history speaks very loudly. The longer you are in jail, the longer the public is protected against future crimes.

*Id*. at 47.

The assessment that the § 3553(a) factors demand the sentence imposed remains compelling today. It is undisturbed by the factors Fernandez cites about his time in prison—the challenging conditions he has encountered and the growth in maturity he claims to have experienced in prison. *See* Def. Mtn. at 10–11. It is also undisturbed by the recalibration of crack and cocaine quantities as reflected in the AG's Memorandum. As the above discussion reflects, the Court's assessment at sentencing of the just and reasonable sentence was not driven by details as to the quantity of crack distributed, save that the quantity had been huge. It was,

instead, driven by the qualitative factors reviewed above, which, as reflected, the Court found highly aggravating. Indeed, the Court specifically stated that the facts of Fernandez's offense, and not its tabulation of the advisory guideline range, had driven its assessment of the just sentence. *See* Sent. Tr. at 27–28.

For these reasons, the Court denies Fernandez's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). The Clerk of Court is respectfully directed to terminate the motion pending at docket 207.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: March 21, 2023
    New York, New York

13