UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

ANGELO FERNANDEZ,

                                        Defendant.

---

13 Cr. 20 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a *pro se* motion by defendant Angelo Fernandez for compassionate release from Federal Correctional Institution ("FCI") Raybrook, in Raybrook, New York, pursuant to 18 U.S.C. § 3582(c).  Fernandez filed a similar such motion last year, which the Court, on March 21, 2023, denied as frivolous.  *See* Dkt. 213 ("First CR Decision").  For the reasons that follow, the Court denies Fernandez's latest such motion.

I. **Background**[1]

    A. **Fernandez's Offense, Trial, and Sentencing**

Fernandez's offense conduct, as established at trial and as set forth in the presentence report ("PSR"), Dkt 210, Ex. A ("PSR") was as follows.  For nearly a decade, Fernandez led a violent narcotics crew that sold prodigious amounts of crack cocaine and marijuana.  The crew dominated the 1300 block of Plimpton Avenue in the Bronx.  The crew was based in Fernandez's apartment building at 1360 Plimpton Avenue ("1360 Plimpton")—over whose residents and workers, Fernandez, using threats of retaliation, wielded effective control—and

---

[1] The background here is reproduced substantially verbatim from the First CR Decision.  *See id.* at 1–3.

stored its drugs, drug paraphernalia, and at times, a gun, there. The crew made drug sales throughout and around 1360 Plimpton and in an adjacent playground, where the crew also stashed narcotics, including in a fountain. Fernandez, who went by the nicknames "El Patron," "Scarface," and "Plimpton King," supervised the crew's more than five members, who primarily carried out the crew's hand-to-hand crack sales. Fernandez used violence and threats of violence to maintain authority. On one occasion, a new resident of the building, Itzel Casanova, confronted him about the drug sales; Fernandez shot her, grazing her in the back. Fernandez also memorably threatened to stab 1360 Plimpton's superintendent, Rafael Rodriguez, and Rodriguez's wife and four children, if Rodriguez, who had called the police about the drug dealing in the building, did not relocate. There was credible testimony at trial, too, of similar retaliatory threats by Fernandez towards another superintendent and a property manager at 1360 Plimpton.

On January 11, 2013, Fernandez and others were indicted on two counts—one charging participation in a crack cocaine and marijuana conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), and another charging possession of a firearm in furtherance of that offense, in violation of 18 U.S.C. § 924(c). Upon his co-defendants' arrest, Fernandez went into hiding; on March 1, 2013, he was eventually found, hiding under a bed in the home of a family friend, and arrested. Fernandez was convicted after a four-day jury trial on Count One—on which the jury found a conspiracy to traffic in 280 grams or more of crack cocaine—and acquitted on Count Two. On July 30, 2014, the Court sentenced Fernandez to a Guidelines sentence of 325 months' imprisonment, to be followed by five years' supervised release, finding—as developed below—numerous 18 U.S.C. § 3553(a) factors to demand a long prison term. *See* Dkt. 169 at 36–53 ("Sent. Tr.").

Fernandez's conviction was affirmed by the Second Circuit on January 28, 2016. Dkt. 189. His release date from FCI Raybrook is projected as January 28, 2037. Dkt. 223 at 4.

### B. Fernandez's First Compassionate Release Motion

On January 27, 2023, Fernandez, *pro se*, filed a motion for compassionate release. *See* Dkt. 207. He argued that the COVID-19 pandemic presented a risk to his health; that prison conditions since the onset of the pandemic had been harsh; and that the Court should use the opportunity presented by his motion to reduce his sentence in light of a recent memorandum from U.S. Attorney General Merrick Garland with respect to charging decisions and sentencing advocacy in narcotics cases, including defining more narrowly than previously the circumstances under which the Department of Justice would henceforth charge amounts triggering mandatory minimum sentences. Fernandez argued that the § 3553(a) factors also supported his release because he had completed numerous educational and vocational training programs in prison and because he had worked hard to become a better person. The Government opposed Fernandez's motion. *See* Dkt. 210.

On March 21, 2023, the Court denied Fernandez's motion, for two independent reasons, finding the motion frivolous. *See* First CR Decision at 4–13.

First, Fernandez did not identify extraordinary or compelling circumstances justifying his release. He had predominantly relied on the risks presented to prisoners by the COVID-19 pandemic, but that argument failed because, *inter alia*, Fernandez did not show any underlying medical or physical condition that put him at greater risk were he to contract COVID-19, and had not been vaccinated or boosted. *Id*. at 5–7. Fernandez separately relied on Attorney General Garland's December 2022 Memorandum, directing federal prosecutors, in charging decisions and sentencing advocacy, to treat crack cocaine as equivalent to powder cocaine, and delineating

3

when narcotics offenses should be charged so as to carry, in the event of conviction, mandatory minimum sentences.  But that development did not assist Fernandez's bid for compassionate release.  *Id*. at 7–8 (citing *Additional Department Policies Regarding Charging, Pleas, and Sentencing in Drug Cases*, Op. Att'y Gen. (Dec. 16, 2022)).  The memorandum by its terms was prospective only, and inapplicable to defendants like Fernandez who had been sentenced before it took effect.  And even had it applied retroactively, Fernandez could not credibly seek relief under it, for reasons including that his relevant offense conduct involved "the use of violence, the direction to another to use violence, [and] the possession of a weapon," which removes a defendant from the scope of the memorandum.  *Id*. (citations omitted).  That Fernandez had played a "significant managerial role in the trafficking of significant quantities of drugs" would separately deny him relief under the Memorandum.  *Id*. at 8 (citations omitted).

Second, the § 3553(a) factors continued to support the sentence imposed.  The Court reviewed at uncommon length its detailed analysis at sentencing of these factors, excerpting long portions of its assessment there of why the interests in just punishment, specific deterrence, and public protection demanded the sentence imposed.  *Id*. at 8–12.  The Court concluded that its assessment at sentencing that these factors "demand the sentence imposed remains compelling today."  *Id*. at 12.  That assessment, the Court stated, was undisturbed by the factors Fernandez had cited, including the challenging prison conditions he had encountered, his claim to have grown in maturity, and the recalibration of crack and cocaine quantities as reflected in Attorney General Garland's memorandum.  *Id*. at 12.

## C.   Fernandez's Latest Compassionate Release Motion

On November 21, 2024, Fernandez, again *pro se*, filed a new motion for compassionate release.  Dkt. 221 ("Second CR Mot.").  He cited five purported extraordinary and compelling

bases for release.  These were: (1) he was young, age 18, when he began his narcotics

trafficking; (2) his sentence, in his view, was "unusually long" compared to comparable cases

involving narcotics and violence; (3) a sentencing enhancement for firearms possession that the

Court had included in tabulating his sentencing guidelines range would today not be sustainable

in light of a recent Sentencing Commission amendment related to the treatment of acquitted

conduct; (4) he is entitled to a reduction in sentence under Amendment 821 to the Sentencing

Guidelines; and (5) his purported rehabilitation.  *See* Second CR Mot. at 9.  On December 20,

2024, the Government filed a memorandum opposing Fernandez's motion.  *See* Dkt. 223 ("G.

Opp.").

## II.  Discussion

### A.  Standards Governing Compassionate Release Motions

"[U]pon motion of the defendant," and "after the defendant has fully exhausted all

administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the

defendant's facility," the Court may reduce such defendant's sentence if it finds that

"extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A).

The defendant bears the burden of proving he is entitled to compassionate release.  *See United

States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased

punishment, he or she has the burden of showing that the circumstances warrant that decrease."

(citation omitted)); *see also, e.g.*, *United States v. Clarke*, No. 9 Cr. 705, 2010 WL 4449443, at

*1 (S.D.N.Y. Oct. 29, 2010).

Originally, § 3582(c)(1)(A) did not permit defendants to initiate compassionate release

proceedings; it required the BOP to seek such release on their behalf.  *See United States v.*

*Philibert*, 557 F. Supp. 3d 456, 459 (S.D.N.Y. 2021).  However, "[a]s part of the First Step Act of 2018, Congress authorized courts to reduce a term of imprisonment upon motion by a defendant."  *United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022) (per curiam).

Although Congress tasked the Sentencing Commission with identifying the circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence, *United States v. Brooker*, 976 F.3d 228, 232 (2d Cir. 2020) (citing 28 U.S.C. § 994(t)), before November 1, 2023, the Sentencing Commission's only guidance on this point had been promulgated prior to the enactment of the First Step Act.  This guidance thus applied only to a "motion of the Director of the Bureau of Prisons," *see* U.S.S.G. § 1B1.13 (historical note), and not "to compassionate release motions brought by defendants," *Brooker*, 976 F.3d at 236; accordingly, the Second Circuit held in 2020, this guidance "[could not] constrain district courts' discretion to consider whether any reasons [were] extraordinary and compelling" in such cases, *id*.  *See also id.* at 237 ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").  Thus, through November 1, 2023, when assessing a motion brought by an imprisoned defendant and not the BOP, a district court was not constrained by U.S.S.G. § 1B1.13's enumeration of extraordinary and compelling reasons and could "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Id.* at 237.

Effective November 1, 2023, however, the Sentencing Commission amended the Guidelines to also cover defendant-initiated petitions.  *See generally* U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254 (effective Nov. 1, 2023).  The

amended guidance from the Commission as to what constitutes extraordinary and compelling reasons now controls the analysis of a compassionate release petition, however initiated.

The Commission's updated guidance identifies six circumstances that, singly or in combination, may so qualify. U.S.S.G. § 1B1.13(b). These are:

- *Medical circumstances of the defendant.* In addition to previously recognized circumstances such as a defendant suffering from a terminal illness or a serious medical condition. *Id.* § 1B1.13(b)(1)(A)–(B), the amended guidelines direct courts to consider whether the defendant is "suffering from a medical condition that requires long-term or specialized medical care" that is not being provided in prison and without which the defendant is at risk of serious health deterioration or death, *id.* § 1B1.13(b)(1)(C), or is held at a facility affected by or at imminent risk of being affected by an outbreak of infectious disease or other "ongoing public health emergency declared by the appropriate federal, state, or local authority," where "due to personal health risk factors and custodial status," the defendant is at a greater risk of severe complications upon exposure, and where "such risk cannot be adequately mitigated in a timely manner." *Id.* § 1B1.13(b)(1)(D). This factor was informed by compassionate release decisions coming out of the COVID-19 pandemic. *See* U.S. Sent'g Comm'n, Guidelines Manual 2023: Supplement to Appendix C at 206 (Nov. 1, 2023).

- *Age of the defendant.* Coupled with a "deterioration in physical or mental health corresponding with the aging process as well as the portion of the original sentence served at the time of a compassionate release motion, this may support sentence reduction. U.S.S.G. § 1B1.13(b)(2).

- *Family circumstances of the defendant.* Where the defendant is the "only available caregiver" for an immediate family member, this may support a sentence reduction. *Id.* § 1B1.13(b)(3).

- *Victim of abuse in custody.* Where the defendant while in custody on the sentence in question was a victim of sexual abuse, or physical abuse resulting in serious bodily injury "committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant," and the misconduct was "established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding," this may support a sentence reduction. *Id.* § 1B1.13(b)(4).

- *Catchall provision.* Where a defendant presents "any other circumstance or [a] combination of circumstances" that themselves or with the above circumstances "are similar in gravity" to those above, such may support sentence reduction. *Id.* § 1B1.13(b)(5). The Commission "rejected a requirement that 'other reasons' be similar in nature and consequence to the specified reasons. Rather, they need be similar only in gravity[.]" U.S. Sent'g Comm'n, Guidelines Manual 2023:

Supplement to Appendix C at 207 ("[T]he Commission continues to believe . . . that judges are in a unique position to determine whether the circumstances warrant a reduction. Guidance beyond that provided in the amended policy statement regarding what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence is best provided by reviewing courts[.]" *Id.* (cleaned up).

- *Unusually long sentence plus changes in law*. Where "a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances." U.S.S.G. § 1B1.13(b)(6).

Finally, even if extraordinary and compelling reasons are present, the Court must also assure itself that release is consistent with "the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A).

## B. Discussion

The Court again denies Fernandez's motion for early release. He again does not come close to establishing any extraordinary or compelling circumstances within the meaning of § 3582(c). And the § 3553(a) factors continue to demand the sentence imposed.

### 1. Extraordinary and Compelling Circumstances

At the outset, Fernandez's argument for relief based on Amendment 821 has already been rejected by the Court. On April 23, 2024, Fernandez moved for a sentence reduction under Amendment 821. Dkt. 215. The Probation Department, however, issued a report finding that Fernandez was ineligible for a sentence reduction, because, even though Fernandez was eligible for a recalculation of his Guidelines range, that recalculation would not change the Guidelines range that the Court treated at sentencing as governing. Dkt. 216. And the Court, in an order dated May 8, 2024, adopted the Probation Department's analysis. Dkt. 217 at 2. Fernandez's

argument on this ground, *see* Second CR Mot. at 23–24, tellingly does not engage with that order, or even acknowledge his earlier motion for relief based on Amendment 821.

Fernandez next argues that his sentence was unusually long and grossly disparate to the sentence he would receive today, given intervening changes in law. *See id*. at 11; *see also* U.S.S.G. § 1B1.13(b)(6). That argument fails for at least two reasons. First, the sentence imposed is not disproportionate to the sentence Fernandez would receive today. As the Court explained in denying Fernandez's first motion for compassionate release, *see* First CR Decision at 8–12, and as the Court reiterates below, it would impose the same sentence today, based on the § 3553(a) factors. Second, Fernandez has not pointed to any intervening change of law that would today give rise to a gross disparity with the Guidelines range used at sentencing. On the contrary, at Fernandez's sentencing, the Court, at the Government's urging, gave Fernandez a two-level downward variance in anticipation of a then-forthcoming amendment to the Sentencing Guidelines. *See* Sent. Tr. at 25–26.[2]

Fernandez next argues that he should gain the benefit of the recent amendment to the Sentencing Guidelines prohibiting the use of acquitted conduct at sentencing. *See* Second CR Mot. at 22; *see also* 89 Fed. Reg. 36,853, 36,854 (May 3, 2024) (amendment effective November 1, 2024). That is wrong for several independent reasons. First, the factual basis on which the Court found applicable the sentencing adjustment in U.S.S.G. § 2D1.1(b)(1) included an act of gun possession distinct from that presented to the jury in connection with Count Two. Count Two was based on the theory that a gun found by police on December 16, 2009, in a bag in the

---

[2] In light of this ruling, the Court does not have occasion to reach the Government's independent argument that § 1B.13(b)(6) was invalid because, notwithstanding the broad authority delegated to the Sentencing Commission, it is inconsistent with the statute's text, structure, and purpose. *See* G. Mem. at 9–10.

apartment of Fernandez's girlfriend, was possessed by Fernandez.  *See* Dkt. 2 ¶ 4 ("Indictment").
The sentencing adjustment the Court imposed, however, was founded on two distinct and
independent acts of gun possession.  One was that underlying Count Two.  The other was a
shooting by Fernandez of a witness, Itzel Casanova, more than two years earlier, on October 3,
2004, soon after they had argued about Fernandez's unauthorized use of her then-vacant
apartment at 1360 Plimpton Avenue to "cut[] up drugs."  Trial Tr. at 45; *see also* Sent. Tr. at 10–
13.  Because the Casanova shooting independently supported the sentencing enhancement,
Fernandez's offense level and sentencing guidelines range today would be unaffected by the
recent amendment regarding acquitted conduct.  And, particularly given Fernandez's other acts
of violence including the Casanova shooting, the December 16, 2009 act of gun possession did
not materially affect the Court's assessment of the § 3553(a) factors or the just sentence.
Second, even if the act of gun possession on which the Court based the sentencing adjustment
had been coterminous with the act on which Count Two was based, the amendment to the
Guidelines with respect to acquitted conduct took effect on November 1, 2024, and was not
made retroactive.  89 Fed. Reg. at 36854.  Third, to the extent that Fernandez seeks relief under
§ 1B.13(b)(6) based on this argument, removal of the adjustment, although reducing Fernandez's
offense level by 2 and thereby his Guidelines range, would not have resulted in a "gross
disparity" with the Guidelines range used at trial.  *See* U.S.S.G. § 1B1.13(b)(6).

Fernandez next cites his youth at the time he joined the crack-cocaine conspiracy as a
basis for a reduction of sentence.  Second CR Mot. at 15.  At sentencing, however, the Court was
aware of Fernandez's age during his offense conduct.  *See* Sent. Tr. at 31–32.  And the crack
conspiracy that Fernandez led lasted nearly 10 years, from 2003 through January 2013.  *See*
Indictment ¶ 1.  Thus, while age 17 or 18 at the conspiracy's inception, Fernandez was nearly

age 27 as of when the conspiracy was broken up by the arrests of his co-conspirators; Fernandez

himself was arrested two months later. *See* PSR at 10. Fernandez's submission on this point

does not alert the Court to any new information. Thus, on the assembled record, Fernandez's age

is not an extraordinary and compelling basis for compassionate release. *See, e.g.*, *United States*

*v. Haylock*, No. 19 Cr. 846-6, 2024 WL 4691023, at *7 (S.D.N.Y. Nov. 6, 2024) (finding that

defendant's youth at the time of the offense was not an extraordinary and compelling reason for

sentence reduction because, *inter alia*, "the conduct at issue persisted over a period of years,

between the ages of 21 and 24 . . . ."); *United States v. Reyes*, No. 10 Cr. 863, 2024 WL

2327135, at *1 (S.D.N.Y. May 22, 2024) ("At 26 years old, [defendant] had sufficient maturity

to know what he was doing. Furthermore, [the court] took Defendant's age into consideration at

sentencing . . . and he ha[d] shown no age-related intervening circumstances warranting . . .

reconsideration."); *United States v. Muse*, No. 9 Cr. 512, 2024 WL 2958526, at *4 (S.D.N.Y.

June 11, 2024) (similar).

  Fernandez next challenges aspects of the Court's sentencing analysis. These include the

claim that his sentence was disproportionate to those imposed on supposed comparators; and that

the Court improperly attributed the full drug weight of the conspiracy to him. *See* Second CR

Mot. at 17. Those arguments are baseless, for the reasons the Government sets out. *See*

G. Mem. at 12 (case citations omitted). Fernandez also cites the gap between the Guidelines'

historical treatment of crack versus powder cocaine. *See* Second CR Mot. at 18. But the Court

addressed and rejected this argument in denying Fernandez's first motion under § 3582(c), which

sought relief based on Attorney General Garland's 2022 memorandum on this point. *See* First

CR Decision at 7–8. In any event, the case law does not support granting Fernandez's § 3582(c)

motion on the basis of this disparity. *See, e.g.*, *United States v. David*, 12 Cr. 214, 2024 WL

4054359, at *5 (S.D.N.Y. Sept. 5, 2024) (denying motion for sentence reduction based on historical treatment of crack versus powder cocaine).  And, as the sentencing transcript reflects, Fernandez's sentence here was not driven by the Guidelines range, but instead by the § 3553(a) factors, as heavily influenced by the violence and intimidation Fernandez used in leading the decade-long narcotics conspiracy.  *See* Sent. Tr. at 36–53; *see also* First CR Decision at 12 (noting that the Court's assessment of the § 3553(a) factors was "undisturbed by the recalibration of crack and cocaine quantities as reflected in the AG's memorandum," and noting that its "assessment of the just and reasonable sentence was not driven by details as to the quantity of crack distributed, save that the quantity had been huge").

Fernandez's final argument is that he has purportedly taken steps towards rehabilitation. *See* Second CR Mot. at 9, 11 (citing involvement in education and other programs offered by the BOP); *id.*, Ex. B (listing courses and programs completed); *id.*, Ex. C (letters in support). Fernandez is to be commended for making productive use of his time in custody.  Such, however, is expected of federal inmates and is not uncommon.  *See United States v. Cueto*, No. 11 Cr. 1032-80 (PAE), 2024 WL 4345569, at *5 (S.D.N.Y. Sept. 30, 2024); *United States v. Torres*, No. 16 Cr. 500, 2021 WL 1131478, at *3 (S.D.N.Y. Mar. 24, 2021).  And it is well settled that rehabilitation alone cannot establish an extraordinary and compelling reason for early release.  *See, e.g.*, *United States v. Corbett*, No. 10 Cr. 184 (PAE), 2023 WL 8073638 (S.D.N.Y. Nov. 21, 2023) (defendant's "participation in programming d[id] not make out an extraordinary circumstance"); *United States v. Needham*, No. 6 Cr. 911, 2022 WL 19769, at *4 (S.D.N.Y. Jan. 3, 2022) (finding rehabilitation through prison programming did not rise to the level of extraordinary and compelling reason for early release); *United States v. Bolden*, 15 Cr. 466, 2021 WL 242551, at *2 (S.D.N.Y. Jan. 25, 2021) ("[P]articipation in or completion of [programming],

while laudable, is not an extraordinary and compelling reason warranting a compassionate release."); *United States v. Marmolejos*, No. 19 Cr. 626 (PAE), 2021 WL 807128, at *4 (S.D.N.Y. Mar. 3, 2021) (defendant's "commendable" efforts at rehabilitation in prison fell "well short" of justifying compassionate release).  Further, as the Government notes, Fernandez's record in custody has also been marked by disciplinary sanctions, including recent ones for using drugs and alcohol, and earlier ones for infractions including fighting, assault, and possessing a dangerous weapon.  *See* G. Mem. at 13 & Ex. B; *see also, e.g.*, *United States v. Strong*, No. 11 Cr. 1032-31 (PAE), 2021 WL 75660, at *5 (S.D.N.Y. Jan. 7, 2021) ("Strong's disciplinary history while at USP Canaan . . . undermines the Court's confidence as to his asserted rehabilitation.").

The Court accordingly again finds that Fernandez has not shown extraordinary and compelling circumstances supporting his early release.

### 2.  Section 3553(a) Factors

Even assuming that such circumstances existed, the § 3553(a) factors emphatically would not justify a reduced sentence.  In denying Fernandez's first motion under § 3582(c), the Court recapped at uncommon length its articulation at sentencing of the most significant reasons for that sentence.  *See* First CR Decision at 9–12.  That analysis, the Court stated, "remains 100% persuasive to the Court today" and "underscores why the § 3553(a) factors are incompatible with a reduction of Fernandez's sentence.  *Id*. at 9.

The Court reproduces here its synopsis in the First CR Decision of those factors.

***Just punishment***: The long conspiracy to sell huge volumes of crack had endangered users and their families and took place in a playground, in close proximity to children.

> While your deputies sold crack, little children stood just feet away[,] playing.  Did it ever occur to you, at the time you were peddling drugs there[,] what effect

13

> exposing the children to drug dealing in a playground might have? Did it occur to you that it might make drug dealing and crack seem [like] legitimate or acceptable options in their eyes? Did it occur to you that it might make it more likely that some[]day[,] some of them would turn to drugs? Or was that part of the plan, simply to create a bigger market and more future customers?

Sent. Tr. at 38–39. The drug dealing was also deleterious to residents of the apartment building

which Fernandez controlled and from which his crew sold:

> [T]he 1360 Plimpton building was infested with drugs. They were tucked behind the stairs and exit signs, in an emergency light, in an empty apartment, and in the garbage area. There were black plastic bags hanging from the window sills. The selling took place at all hours of the night, and . . . sometimes with lines out the door. People who wanted nothing to do with crack deals had no choice but to coexist with your crack operation. They, too, were victims of your conduct.

*Id*. Perhaps most disturbing was Fernandez's "use of intimidation, or threats of violence, to

protect [his] crack operation," about which four civilian witnesses had credibly testified. *Id*. at

39. Those instances, as summarized by the Court at sentencing, included the following:

> First, Itzel Casanova. She leased an apartment in 1360 Plimpton Avenue. She was soon to move in. She got a call from a friend saying there were men in the kitchen of the new apartment[,] selling drugs. She taxied over there. When she got to the apartment, you were there. You told her that it was actually your apartment. She was on the lease, but it was, you told her, your apartment. Ms. Casanova testified, about you. "He was cursing, he was very upset, he was very intimidating." She left, to go retrieve her three-year-old, but the intimidation wasn't over. On the way out, shots were fired. Ms. Casanova was grazed by a bullet on her shoulder blade. She ran away. Her concern was her safety and that of her son. She never moved into the apartment.
>
> Second, Rafael Rodriguez. He was the superintendent of 1360 Plimpton Avenue. If Ms. Casanova's mistake was to lease an apartment you used for your drug operation, Mr. Rodriguez's mistake was to call the police on you. He saw drug buyers coming in and out of the building to sell drugs. He determined that you were in charge of the drug operations. He was, of course, right about that. He saw you interacting with the dealers, exchanging money. He saw you yell at the dealers, he saw you threaten them. At one point he saw you hang one of your dealers over the edge of the building. Mr. Rodriguez asked you to stop selling drugs at 1360 Plimpton, but it didn't stop. To his credit, Mr. Rodriguez kept at it. He took his job seriously. At one point, he confronted a man who was selling drugs from an empty apartment in the building, but, he testified, you, Mr. Fernandez, intervened. You told Mr. Rodriguez that you were in charge of the building. You

14

threatened him. He testified about you: "He threatened me. He said that, you know, you can get hurt, you know. You don't know about it, but you can get hurt." Mr. Rodriguez put padlocks on the empty apartments[,] but you got around that too. He was the superintendent, but you were the king.

Eventually Mr. Rodriguez called the police. One evening on a day [he] had called the police, you and another man confronted Mr. Rodriguez at the front door of his apartment. You told Mr. Rodriguez he had three days to leave the building "or else." Mr. Rodriguez told you he would not leave. So you approached Mr. Rodriguez's front door, in his words, "like he"—meaning you—"like he wanted to fight." Mr. Rodriguez closed the front door. You stayed outside. Two hours later, there was a knock on the door to his apartment. Mr. Rodriguez looked through the peephole. He cracked open the door. He saw you and Gago, one of your coconspirators. You were standing behind Gago[,] pacing. Gago did the talking. Gago said[,] "We have a very serious problem here." Mr. Rodriguez, mind you, had a wife and four children who lived with him in that apartment. Mr. Rodriguez said[,] "[I]t's 10 at night and it better be an emergency," because he didn't appreciate anyone knocking on his door at that hour unless it was an emergency.

This is what he testified happened next: "As soon as I said that, Mr. Fernandez got really mad. He aggressively went to the door, slammed the front door of the lobby, because my door was near there, and then he locked the door. And I took that as intimidating me, that nobody was coming up in here." Mr. Rodriguez continued. This was his further testimony about you: "And then he start[ed] yelling. He start[ed] hitting the floor. He got on one knee started hitting the floor, screaming at me with his muscles all pumped out." Mr. Rodriguez said you told him you had three days to leave the building. Mr. Rodriguez said no. . . . Question: "What happened next?" Answer from Mr. Rodriguez, referring to you: "He came towards me. He came towards me like he wanted to fight. He came towards the door. As soon as I saw him come to the door like that, I close—I close—I close my door."

And this was some of the most dramatic testimony in the case. Mr. Rodriguez grabbed the one weapon he had in his apartment, a baseball bat. He cowered inside his apartment, behind the front door, because he said, "I felt my family was threatened. So I felt that if he came in my house, you know, that I needed to defend my kids and my wife." But you weren't finished. You took up a position outside the first floor window of the apartment where Mr. Rodriguez could hear you. He heard you cursing to your friends. This is what he testified about you: . . . "He was cursing and saying that I didn't know he would go up in there and he would stab everybody up." Question: "What did you understand that to mean?" Answer: That he would come in and kill my whole family," referring to you, Mr. Fernandez. Eventually, Mr. Rodriguez moved out. He moved to South Carolina. And this was his testimony as to why. Question: "How, if at all, did the threat that you received contribute to your decision to move to South Carolina?" Answer: "Yeah, it definitely contributed more than 100 percent because I just didn't feel safe anymore. I didn't feel my kids, my family, my wife were safe anymore."

Third witness, Santos Penn-Richards, the prior superintendent. He was the one who found drugs hidden in the emergency light. He also found a gun hidden in a mailbox. He also made the mistake of calling the police. One of the members of your crew made quite clear to Mr. Penn-Richards that that was a mistake. Your crew member, Mr. Penn-Richards testified, said to Mr. Penn-Richards that they, meaning the drug crew, "suspected that he had called the police on them. And that it was not something good for me, it could be dangerous. Also for my family." Another time, while he was working as superintendent, Mr. Penn-Richards found the brake lines cut on his car which was parked out front of the building. He also moved out. The reason, he testified: "The environment there was too dangerous by then."

Fourth, and finally, Ephraim Weiss. He was the property manager at 1360 Plimpton. He figured out that you were running a drug operation. He called the police. He testified that one time you approached him while he was parking his car across the street from the building. You asked him, he said, "[W]hy I was bothering his business," meaning, of course, the crack business.

*Id.* at 40–44.

**Specific deterrence**: Also supporting the sentence was that Fernandez had persisted in

crime despite a long list of arrests and convictions, some in connection with the offense conduct.

In 2004 you pled guilty to assault[,] and you were sentenced to three years' imprisonment, in connection with striking a police officer with closed fists and a golf club. In 2004, as well, you pled guilty to criminal possession of a loaded firearm. That is the incident in which Itzel Casanova was shot. You were sentenced to one-year imprisonment. In 2008 you pled guilty to disorderly conduct. In 2009 you pled guilty to unlawful possession of marijuana, in connection with selling marijuana. In 2010 you again pled guilty to criminal possession of marijuana. In 2011 you pled guilty to petit larceny. In addition, according to the presentence report, you have had five other arrests—in 2004, 2004 again, 2010, 2011, and 2012—which were either adjourned in contemplation of dismissal, dismissed, or did not yield court-reported information that the probation officer could find. Why do I mention all this? Because none of your many prior brushes with the criminal justice system deterred you. Each of them—and certainly them together—should have been a wake-up call. They should have been a message that said stop. Stop selling cocaine. Stop selling marijuana and committing other crimes. Committing these crimes is no way to go through life. But the message didn't get through.

*Id.* at 45–47.

**Public protection**: Finally, favoring the sentence imposed was the interest in

incapacitation, meaning the need to protect the public from further crimes by you. Given your long criminal record, given your willingness to engage in threats and

16

> intimidation when people got in your way, I regret to say that that factor is very important here. I simply cannot have any confidence that even after a relatively long sentence[,] you would not revert to committing crimes. I wish that were otherwise, but actions speak louder than words[,] and your history speaks very loudly. The longer you are in jail, the longer the public is protected against future crimes.

*Id.* at 47.

The Court's assessment that the § 3553(a) factors demand the sentence imposed remains compelling today.  It is undisturbed by the factors Fernandez cites in his most recent motion, including his contention that his Guidelines range today would be lower than as calculated at sentencing.  Indeed, at sentencing, the Court specifically stated that the facts of Fernandez's offense, and not its tabulation of the advisory Guidelines range, had driven its assessment of the just and reasonable sentence.  *See* Sent. Tr. at 27–28.

The Court accordingly denies Fernandez's renewed motion for compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A) (release permissible only if compatible with § 3553(a) factors); *see also, e.g.*, *United States v. O'Bryant*, No. 16 Cr. 317-3 (PAE), 2023 WL 8447995, at *6 (S.D.N.Y. Dec. 6, 2023) (denying compassionate release even if wife's "physical needs presented an extraordinary and compelling reason for release, [because] his release would be inconsistent with the § 3553(a) factors, viewed as a whole"); *United States v. John*, No. 15 Cr. 208, 2020 WL 6581217, at *3 (S.D.N.Y. Nov. 10, 2020) (denying compassionate release "[e]ven if John had established that his health, or his family circumstances, or some other reason . . . augured in favor of granting his release" because § 3553(a) factors counseled against it); *United States v. Butler*, No. 18 Cr. 834-10 (PAE), 2022 WL 17968627, at *3 (S.D.N.Y. Dec. 27, 2022) (§ 3553(a) factors, considered "in totality," disfavored early release); *United States v. Wright*, No. 15 Cr. 445-3 (PAE), 2022 WL 134870, at *5 (S.D.N.Y. Jan. 13, 2022) (similar); *United States v. Hope*, 464 F. Supp. 3d 646, 650 (S.D.N.Y. 2020) (similar).

## CONCLUSION

For the reasons stated, the Court denies Fernandez's motion for compassionate release.

The Clerk of Court is respectfully directed to terminate the motion pending at Docket 221 and to

mail a copy of this decision to Fernandez at the following address:

> Angelo Fernandez
> Fed. Reg. No. 68242-054
> FCI Raybrook
> P.O. Box 900
> Raybrook, NY 12977

> SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: December 26, 2024
      New York, New York